No. 41,025

STATE OF KANSAS, *Appellee*, v. HENRY JOHNSON, *Appellant*.

(340 P. 2d 373)

Opinion filed June 13, 1959.

*Elisha Scott* and *Samuel C. Jackson*, both of Topeka, argued the cause, and *John J. Scott* and *Charles S. Scott*, both of Topeka, were with them on the briefs for the appellant.

*Roy L. Bulkley*, former County Attorney, argued the cause, and *John Anderson, Jr.*, Attorney General, and *Robert E. Hoffman*, Assistant Attorney General, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: Defendant was charged with murder in the first degree. He was convicted of murder in the second degree and has appealed.

The killing occurred on the night of January 21, 1957, on the front steps of defendant's home at 318 Quincy Street, Topeka. For some time prior thereto defendant, who was thirty years of age and who was partially disabled as the result of an injury sustained while in military service, had been keeping company with a woman by the name of Roxie Brown. Their "relationship" was of an intimate nature and she had been living with him at his home. Shortly prior to the night in question they had become estranged and she went to live with her mother. During this period of "estrangement" Roxie had been keeping company with Johnny George, the deceased. On the night in question Roxie, George and some of their friends were in a beer tavern drinking beer and dancing. Defendant telephoned the tavern and requested Roxie to leave and come to his home so that they could straighten out their difficulties. She replied that she would. About five minutes later defendant again called her at the tavern requesting that she leave and come to his home. During this conversation she told him that she was with George. Shortly thereafter she and George left the tavern in George's car and drove to defendant's home., She went into the house. George remained in the car out in the street. A few minutes later he started blowing his horn. Defendant went to the front door of his home and told George to quit it, that he was disturbing the neighbors. Defendant then returned to the kitchen and resumed his conversation with Roxie. A few minutes later George again started blowing his horn, whereupon defendant went to the door and told him to stop it. An argument then developed between the two men. Roxie came to the door and told George to "go on" and that she was going to stay and go back to the tavern later with defendant. Upon being informed of Roxie's decision George got out of his car, came into the yard and started up the steps to the front porch. He demanded that Roxie leave with him. The argument became more heated and profane. George grabbed Roxie and started pulling her away. Defendant resisted and started pulling her back. In the struggle she lost her footing and fell over the porch banister. Meanwhile the argument continued. As George came toward defendant, he, the defendant, pulled a "22" revolver from his belt and commenced firing at George. He fired six shots in rapid succession, each of which hit George. Four of the shots entered the back part of his body. George staggered into the street and died shortly thereafter. At defendant's request

a friend called the police. Upon their arrival they found defendant standing over George's body in the street with the revolver, the cylinder of which was open, in his hand. Defendant was taken into custody and, as before stated, was subsequently charged with murder in the first degree.

The foregoing is intended as a general outline of the evidence showing the events leading up to the killing. At the outset it should be stated that defendant at no time denied the killing, and that his entire defense was based upon the law of self-defense— therefore the killing was justifiable.

We will discuss various contentions made by defendant in this appeal.

First, it is contended that Roxie Brown was the common-law wife of defendant and therefore, under G. S. 1949, 62-1420, could not be compelled to testify for the state against him.

The court heard testimony on this point in the absence of the jury and found that the "relationship" of the parties was not such as to create a common-law marriage. It is unnecessary to discuss this testimony in detail. Entirely aside from the fact evidence was introduced showing that she had been divorced from another man just four months previous to the killing and therefore was without present capacity to enter into a common-law marriage with defendant, we agree with the trial court the evidence of the so-called common-law marriage fell far short of creating such relationship, and it was not error to require Roxie to testify for the state.

Several hours after the killing defendant was questioned by the officers in the presence of a court reporter who took down the questions and answers. This statement was admitted in evidence after the court heard testimony concerning the circumstances in connection with the taking of it. Defendant complains there was no showing that the statement was given voluntarily; that he was apprised of his rights, or that he had been told it might be used against him. There is no merit to this contention. It was clearly shown that the statement was voluntary; that defendant had been apprised of his rights and told that it might be used against him. Furthermore, the statement itself was substantially identical to the testimony given by defendant at the trial and contained nothing of a more damaging nature than did defendant's own testimony.

A few moments after the shooting one Crim, who was in defendant's home, wrapped a knife in a towel, gave it to Roxie and

told her to throw it out on the porch. She did so. It was later found by the officers and was introduced by the state in evidence. Defendant claims that this was error because it was not shown that he had any knowledge of the incident. For the sake of argument, it will be conceded that he did not, and it is conceded that Crim wanted the knife placed out on the porch to make it appear that George attacked defendant with it, and that defendant thus was justified in shooting him. Perhaps evidence of this incident was of questionable competency, but, in view of defendant's own testimony as to self-defense, its admission cannot be said to have prejudiced defendant in any way.

It next is argued that it was prejudical error for the court to admit in evidence a bloody shirt and jacket obtained from the mortuary, and which were worn by the deceased at the time he was shot. We likewise find no merit in this contention, if for no other reason than that defendant at all times admitted the shooting, his sole defense being that of self-defense.

It is contended the court erred in denying defendant the right to introduce evidence of the reputation of the deceased as being turbulent and quarrelsome. A careful examination of the record on this point shows that when testifying in his own behalf defendant was questioned as to his *present* knowledge of deceased's reputation as to these matters, but was not questioned as to his *prior* knowledge of the same. In fact, the court told counsel that if they proceeded properly such evidence would be admissible. They did not do so, however, and the court did not err in its ruling.

In defendant's case in chief a brother of defendant testified that on the night of the shooting—although he had not yet heard anything about it—he went to defendant's residence and in the yard found a glove containing some "brass knucks." During the course of his examination he was asked a number of questions by the court, and it is claimed the nature of the questions was such as to prejudice defendant. We have examined the questions and answers and find no merit in this contention.

Next, it is contended the court erred in refusing to give several instructions requested by defendant concerning the issue of self-defense and the voluntary nature of the alleged "confession."

We have examined in detail the thirty-seven instructions given by the court. The jury was instructed on murder in the first degree, murder in the second degree, and manslaughter in the first, third

and fourth degrees. The jury was thoroughly and correctly instructed on the law of self-defense and justifiable and excusable homicide. It was not given a specific instruction relating to the question whether the so-called statement given by defendant was voluntary. Assuming, for the sake of argument, that ordinarily such an instruction would be proper, there was, under the evidence in this case, no occasion to give one relating to the matter because, as heretofore stated, defendant took the witness stand and testified to all matters contained in his so-called statement. The jury was properly and fully instructed on all matters in issue, and the court did not err in refusing any of the requested instructions.

One other point requires attention. The record before us does not contain the journal entry of the court's judgment and sentence, but we are "told" by defendant in his brief that a sentence of from ten to thirty years was imposed. G. S. 1949, 21-403, provides that the penalty for murder in the second degree shall be confinement and hard labor for not less than ten years. Under G. S. 1949, 21-109, defendant could have been sentenced for his lifetime. In the absence of an affirmative showing to the contrary, the presumption is that a lawful sentence was imposed upon defendant under the mentioned statutes. Defendant contends, however, that his sentence should have been not in excess of seven years, as provided by G. S. 1957 Supp. 62-2239, which took effect July 1, 1957. There is no merit to this contention. This offense was committed on January 21, 1957, and the rule is that where the penalty for an offense has been changed by an amendment of the law since the offense is charged or proved to have been committed, the penalty imposed must be under the law as it stood when the offense was committed. (*State v. Woodbury*, 132 Kan. 22, 294 Pac. 928, Syl. 8.) We refuse to enter into an academic discussion of the 1957 act, as requested by defendant, for the reason that it clearly is inapplicable to this case.

And finally, it is contended the evidence clearly demonstrated that this killing was done in self-defense and therefore justifiable.

As before related, defendant testified in his own behalf and painted a rather vivid picture of the facts and circumstances as they appeared to him at the time he and the deceased engaged in the argument and skirmish on the steps and front porch of his home. The jury had a full picture of the entire matter but apparently took little stock in the self-defense feature of the case, as was within their province. A careful examination of this record shows

nothing approaching reversible error such as to warrant a new trial. There was ample competent and substantial evidence to support the conclusion reached by the jury and, its verdict being approved by the trial court, the judgment must be and is affirmed.